IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:19-cv-00447-BR

| | | |
|---|---|---|
| ROBERT JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | **DEFENDANT** |
| | ) | **RAND MANUFACTURING, INC.'S** |
| v. | ) | **MEMORANDUM OF LAW** |
| | ) | **IN SUPPORT OF ITS** |
| RAND MANUFACTURING, INC., | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| Defendant. | ) | |

Defendant Rand Manufacturing, Inc. ("Rand"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7.2 and 56.1, submits the following Memorandum of Law in support of its Motion for Summary Judgment.

## **NATURE OF THE CASE**[1]

This action stems from an industrial accident that occurred at a truss manufacturing facility in West Monroe, Louisiana. Rand manufactured and sold the Final Roller at issue in this litigation to a now-defunct truss manufacturer in Hammond, Louisiana, in 2008. Plaintiff's employer, Rogers Manufacturing Corporation ("RMC"), purchased the Final Roller at a bankruptcy sale in 2012. Ten years after Rand originally manufactured and sold the equipment, RMC regularly operated the Final Roller in a broken condition and in complete contradiction to the Final Roller's intended use as well as the instructions and warnings contained in the machine's Operator's Manual. On October 19, 2018, Plaintiff, poorly trained and virtually unsupervised, decided to enter a restricted area and place himself between a truss that had become stuck on the broken feed rollers and the face of the machine. While manually dragging the truss into the Final Roller

---

[1] As a preliminary matter, because Plaintiff's alleged injuries occurred in West Monroe, Louisiana, and because the location of the tort is the deciding factor under North Carolina's choice of law analysis of *lex loci delicti*, the parties previously stipulated that the substantive law of Louisiana applies to this action. *See* [D.E. 32].

Plaintiff pinned himself against the entry point of the Final Roller. As Plaintiff attempted to escape the situation, his right leg entered the machine, causing his injuries.

After originally filing suit in the Western District of Louisiana, Plaintiff filed the current action against Rand and Truswood Manufacturing, Inc., in this Court on October 11, 2019, alleging violations of the Louisiana Products Liability Act. [D.E. 1]; *see also* La. Stat. Ann. § 9:2800.51, *et seq*. Rand and Truswood each answered the Complaint on January 31, 2020. [D.E. 19 and 20]. Truswood was subsequently dismissed from the suit on June 12, 2020. [D.E. 30]. The parties have completed fact and expert discovery and, as such, Rand's Motion for Summary Judgment is ripe for adjudication.

## STATEMENT OF FACTS

Rand is a truss equipment manufacturer located in Raleigh, North Carolina. [Deposition of Richard Watts 23:24-24:11]. In the summer of 2008, Rand sold a roof truss line to American Truss in Hammond, Louisiana. *See* [D.E. 42-7, 39-8]. This package included a gantry table, a Final Roller, and eighty-two feet of feed rollers. *See* [D.E. 42-7]; *see also* [D.E. 42-4] (displaying the equipment as it existed in 2018 with the gantry table on the right side of the photograph and the feed rollers in the center of the photograph leading to the Final Roller in the background). In 2012, Rogers Manufacturing Corporation ("RMC") purchased the roof truss line at American Truss's bankruptcy sale. *See* [D.E. 42-8]. RMC's maintenance supervisor, Joseph Allen, transported the Final Roller from the American Truss facility and installed it at RMC's West Monroe, Louisiana facility. [Deposition of Joseph Allen 15:18-19; 19:6-9]. RMC did not receive a copy of the Operator's Manual for the Final Roller from American Truss and did not contact Rand to obtain a copy of the Operator's Manual that had been supplied to American Truss when the machine was originally sold. [Allen Dep. 18:24-19:5]; *see also* [D.E. 42-6]; [Watts Dep. 42:2-5] (confirming that American Truss received a copy of the Operator's Manual).

2

The Operator's Manual for the Final Roller contained several critical instructions and warnings for the operation of the Final Roller. First, the Operator's Manual established two "Restricted Zones" around the area of operation of the Final Roller. *See* [D.E. 42-6 at 4]. Individuals operating the Final Roller were instructed to "stand clear of the Restricted Zones" when the Final Roller was active, which was defined as any time a portion of the machine is in operation or a truss is within the confines of the machine. *See* [D.E. 42-6 at 4]. The Operator's Manual warned that "SERIOUS INJURY OR DEATH MAY RESULT TO PERSONNEL IN THE RESTRICTED ZONES . . . WHEN MACHINERY IS ACTIVE." *See* [D.E. 42-6 at 4] (emphasis and color in original). Second, the Operator's Manual provided important "SAFETY & OPERATING INFORMATION." *See* [D.E. 42-6 at 7] (emphasis and color in original). Rand instructed the user to check the proper operation of the safety bars and brake daily before each shift begins. *See* [D.E. 42-6 at 7]. Rand instructed users never to enter the area directly in front of the Final Roller "UNLESS ALL AIR AND ELECTRIC IS DISCONNECTED." *See* [D.E. 42-6 at 7] (emphasis and color in original). Rand further instructed the users to refer "ANY AND ALL MALFUNCTIONS" to "QUALIFIED REPAIR PERSONNEL" and explicitly cautioned that "UNDER NO CIRCUMSTANCES SHOULD THE EQUIPMENT BE OPERATED WITH DAMAGED OR NON-MANUFACTURER SUPPLIED PARTS" and that "SERIOUS INJURY OR DEATH MAY RESULT IF THIS MACHINE IS NOT OPERATED AND MAINTAINED PROPERLY." *See* [D.E. 42-6 at 8] (emphasis and color in original). Rand also warned users "WHENEVER THIS MACHINE IS OPERATING, KEEP HANDS AND OTHER BODY PARTS CLEAR OF THE WORKING ROLLERS." *See* [D.E. 42-6 at 9] (emphasis and color in original).

RMC employed several individuals responsible for the production of trusses utilizing the roof-line system. A team of employees worked at the gantry table to layout and assemble the

3

trusses utilizing metal connector plates. [Deposition of Jason Niblett 29:4-10]. The connector plates would be partially seated at the joints of the truss by the employees. [Deposition of Justin Smith 39:3-25]; *see also* [D.E. 42-2 at timestamp 07:30:30] ("Surveillance Video"). A gantry press would roll over the trusses on the tables to seat the plates more fully. [Smith Dep. 39:3-25]; *see also* [Surveillance Video at time stamp 07:34:40]. The truss would then be shifted to the feed rollers that led to the Final Roller via hydraulic arms that lift the truss off the gantry table. [Niblett Dep. 29:21-30:2]; *see also* [Surveillance Video at time stamp 07:35:45]. At this point, the truss is automatically conveyed from the point it is placed on the feed rollers to and through the Final Roller where the connecting plates are fully seated. [Jackson Dep. 43:6-15]; *see also* [Smith Dep. 72:4-8]; [Deposition of Tom Williams 72:22-15] (explaining that the feed roller system automatically set up a truss to run through the Final Roller and that no manual input was required]; [Surveillance Video at time stamp 07:30:30] (displaying the feed rollers on the left side of the video automatically carrying a truss to the Final Roller until they hit a section of feed rollers that are broken). After the truss exits the Final Roller and is transported a safe distance by the outfeed rollers, the stacker removes the truss and places it in a holding area at the facility. [Jackson Dep. 43:6-15]; *see also* [Smith Dep. 54:14-22; 73:6-20]; [D.E. 42-5] (displaying the back of the Final Roller and the outfeed rollers).

Plaintiff worked for RMC on two separate occasions with his second stint beginning approximately one month before the incident. *See* [Niblett Dep. 17:10-13]; *see also* [Niblett Dep. Ex. H, item B.7., attached as Exhibit A]. During his rehire training, Plaintiff received a safety orientation process that included viewing a general safety video provided by the building industry and a safety slide show created by RMC and taking a test reviewing that information. [Niblett Dep. 19:16-20:13]. As an incoming stacker, Plaintiff did not receive training on lockout/tagout procedures and stated that he did not know what lockout/tag out meant. [Niblett Dep. 20:14-

21:11]; *see also* [Jackson Dep. 20:19-24]. After the safety orientation, Plaintiff received on-the-job training, including training on unauthorized or restricted areas. [Jackson Dep. 30:13-22]. Plaintiff's training on the Final Roller was limited to the "stop and go buttons" and, that Plaintiff could recall, did not include instruction on areas around the machine that employees were not permitted to access. [Jackson Dep. 34:6-18]. Plaintiff worked exclusively as a stacker on the Final Roller during his second stint of employment. [Jackson Dep. 35:21-36:15].

RMC employees provided conflicting testimony regarding the company's policies and procedures for employees entering the restricted area in front of the face of the Final Roller. RMC's Human Resources Director and safety manager, Jason Niblett, testified that, while there was no written policy restricting access to the area, it was "not at all" permissible for employees to be in the area between the feed rollers and the Final Roller. [Niblett Dep. 53:4-11; 70:25-71:9]. However, Niblett also testified that RMC permitted its employees to access the restricted area to "guide a truss or something." [Niblett Dep. 61:3-5]. Plant Manager Garrett Hudson testified that, before the incident, RMC did not restrict the area in front of the Final Roller, but also noted that he was not aware that employees were entering that area. [Deposition of Garrett Hudson 24:16-21; 26:7-25]. Production Manager Velino Loyola testified that workers were not allowed to enter the area in front of the Final Roller. [Deposition of Velino Loyola 16:21-17:9].

On October 19, 2018, Plaintiff was assigned to work as a stacker on the Gantry 3 Final Roller at the RMC facility. [Jackson Dep. 66:2-7; 107:21-23]. The Final Roller was not inspected, as required by the Operator's Manual, immediately before Plaintiff beginning his shift on October 19, 2018 shift. *See* [D.E. 42-6 at 7]; *see also* [Allen Dep. 33:5-21] (stating that he looked at the limit switch and tested the safety bar a couple of days before the incident and then not again until the afternoon after the incident); [Loyola Dep. 31:16-32:5] (stating that he tested the safety bar the day before the incident and that it was working as intended). At the time of the incident, several

of the feed rollers that convey trusses to and through the Final Roller were broken and thus not functioning as designed. [Allen Dep. 45:16-47:2] (stating that he had been informed that the feed rollers were not operating as designed or intended a couple of days before the incident). Because these feed rollers were not functioning, a truss moving toward the Final Roller would become stuck on the feed rollers and would not make it to the Final Roller. [Exhibit A at 4] ("causing the truss to stop on the rollers in front of the finish press."); *see also* [Surveillance Video at time stamp 07:36:30] (displaying the offending truss traveling down the feed rollers and then becoming stuck just before the Final Roller). Despite being made aware of the broken condition of these feed rollers days prior, the fix taking approximately "five to ten minutes," and RMC having the materials to fix the feed rollers on hand, Maintenance Manager Joseph Allen stated that RMC did not fix the broken feed rollers until after Plaintiff's incident. [Allen Dep. 47:10-48:5].

Because the feed rollers were not operating as designed or intended, and because RMC continued production on this roof truss line despite knowledge of the broken equipment, the automatic process that Rand designed that fed trusses into the Final Roller was converted to a manual process. [Smith Dep. 54:10-22]. Plaintiff testified that he undertook this manual process on his own initiative, "off the top of his head," though Mr. Niblett stated that other employees took the same action. [Jackson Dep. 71:6-14]; [Niblett Dep. 61:3-5]. At 7:37 A.M., Plaintiff walked in front of the Final Roller to manually feed a truss into the Final Roller. [Surveillance Video at time stamp 07:36:50]. Plaintiff grabbed the leading arm of the truss, which was a roof truss designed for a vaulted ceiling—creating a flat beam that was parallel to the face of the Final Roller as it approached the machine—and fed the truss into the Final Roller. [Surveillance Video at time stamp 07:37:00]. As the Final Roller grabbed the truss and pulled it in, the flat beam of the truss struck Plaintiff in the back. [Surveillance Video at time stamp 07:37:06]. In essence, Plaintiff pinned himself against the entry point of the Final Roller. As Plaintiff tried to move, his right leg

went into the opening of the Final Roller and, before his co-workers were able to stop the machine, was crushed. [Surveillance Video at time stamp 07:37:10].

After the incident, RMC added additional signage to the Final Roller, a chain that blocked access to the restricted area in front of the Final Roller, and a light screen that would shut off the motor of the Final Roller if the field of light was broken by an employee trying to enter the area. [Niblett Dep. 60:2-61:22]. In addition, Joseph Allen repaired the Final Roller's limit switch, which was the same type of switch that was originally present on the Final Roller. [Allen Dep. 59:19-20]. While Mr. Allen stated that he changed the orientation of the limit switch when reinstalling, he confirmed that the original orientation of the switch had functioned as designed and intended since RMC purchased the Final Roller in 2012. [Allen Dep. 39:25-40:8].

## QUESTIONS PRESENTED

1.  Was Plaintiff's use of the Final Roller a "reasonably anticipated use" as defined by the Louisiana Products Liability Act?

2.  Was the Final Roller unreasonably dangerous, as defined by the Louisiana Products Liability Act, at the time it left the possession of Rand Manufacturing, Inc.?

3.  Was the Final Roller dangerous to an extent beyond that which would be contemplated by an ordinary user or handler of the product?

4.  Were Plaintiff and Rogers Manufacturing Corporation 100% at fault as a matter of law?

## STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e));

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248(1986). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247–48.

## ARGUMENT

**I.      RMC AND PLAINTIFF'S USE OF THE FINAL ROLLER WAS NOT A REASONABLY ANTICIPATED USE.**

In developing and manufacturing the Final Roller, Rand created an automatic process for conveying trusses from the gantry table to the Final Roller via feed rollers. The intended use of the equipment, as designed, required no human interaction with the trusses or Final Roller for this process to take place. When RMC decided to operate the Final Roller with the knowledge that multiple feed rollers were broken and when Plaintiff decided to manually feed the Final Roller, the use of the Final Roller was altered from an automatic to a manual process. Rand could not have reasonably anticipated this improper use of the equipment and there has been no forecast of evidence by Plaintiff on this point. Further, under statutes and regulations governing occupational safety and health, RMC was solely responsible for providing any guarding or equipment required for its employees to safely operate the Final Roller as a manual process. For these reasons, there is no genuine issue of material fact regarding RMC and Plaintiff's clearly improper use of the Final Roller and, therefore, Rand's Motion for Summary Judgment should be granted.

Under the Louisiana Products Liability Act ("LPLA"), a manufacturer of a product is only liable to a claimant for "damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant." La. Stat. Ann. § 9:2800.54. Reasonably anticipated use is defined as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La. Stat. Ann. § 9:2800.53(7). When

8

determining whether a use is reasonably anticipated, courts have previously considered factors such as:

> (1) whether the injured party used the product in a manner that was obviously dangerous; (2) what the user was instructed to do and warned not to do with respect to the use of the product; (3) whether the use of the product was expressly warned against in the product's labeling (or operations manual) and the language of that warning; and (4) the sophistication/experience of the user-purchaser.

*Broussard v. Procter & Gamble Co.*, 463 F. Supp. 2d 596, 606 (W.D.La. 2006). These factors are analyzed based on "what uses of its product the manufacturer [objectively] should have reasonably expected at the time of manufacture." *Sistrunk v. Dake Corp.*, No. CIV. A. 13-2983, 2015 WL 4164910, at *4 (E.D. La. July 9, 2015). A manufacturer, however, will not be responsible for every conceivable foreseeable use of a product. *Id.*

Most importantly, the LPLA definition of "reasonable use" **does not** include foreseeable misuse. *Frith v. John Deere Co.*, 955 F. Supp. 663, 666 (W.D. La. 1996), *aff'd*, 108 F.3d 332 (5th Cir. 1997) ("The LPLA standard does not encompass foreseeable misuses."); *see also Lockart v. Kobe Steel Ltd. Const. Machinery Div.*, 989 F.2d 864, 867 (5th Cir. 1993); *Delphen v. Dept. of Transp. and Development*, 657 So.2d 328, 332 (La. App. 4 Cir. 1995); *Myers v. American Seating Co.*, 637 So.2d 771, 775 (La. App. 1 Cir. 1994); 1 La. Prac. Pers. Inj. § 4:240 Defenses—Misuse. While the "pre-LPLA standard, 'normal use', included foreseeable uses as well as foreseeable misuses, the LPLA narrowed the meaning of reasonably anticipated use." *Id.* Further, "reasonably anticipated use" under the LPLA does not encompass misuses in direct contravention of a warning. *Broussard v. Procter & Gamble Co.*, 463 F. Supp. 2d 596, 606 (W.D. La. 2006), aff'd, 517 F.3d 767 (5th Cir. 2008); *see also Kampen v. American Isuzu Motors, Inc.*, 157 F.3d 306, 313 (5th Cir. 1998)("it is expected that an ordinary consumer would not use the product in contravention of the express warning.").

At the time of the incident, RMC and Plaintiff were not engaged in a use of the Final Roller that Rand could have reasonably anticipated. Further, even if the LPLA considered foreseeable misuse as a reasonably anticipated use, RMC and Plaintiff were not engaged in a foreseeable misuse of the Final Roller.

> **a. RMC and Plaintiff's operation of the Final Roller in a broken condition was not a "reasonably anticipated use" as defined by the LPLA.**

RMC and Plaintiff's decision to operate the roof truss line in a broken condition converted it from an automatic to a manual production process, which was neither the intended design nor a use that was reasonably anticipated by Rand. All of the record evidence demonstrates that the movement of a truss from the feed rollers through the Final Roller, if functioning as designed and intended, was automatic. Both Plaintiff and his expert, Justin Smith, P.E., testified that the final process in the production of a truss, from the time it is transferred to the feed rollers until it comes out of the Final Roller, was automatic. *See* [Jackson Dep. 43:6-15] (testifying that the feed rollers automatically carry the truss to and through the Final Roller for a stacker to pick up on the other side); *see also* [Smith Dep. 72:4-8] ("Q: And we discussed earlier that if the feed rollers are operating as intended, this is an automatic process. Is that an accurate representation of your testimony? A: Yes."). Mr. Smith further testified that no human input was required if the feed rollers and Final Roller are working as intended. [Smith Dep. 54:10-22]. Further, Rand made clear that the intended use of the Final Roller was to function as an automatic process. [Williams Dep. 73:8-17] (explaining that Rand utilized the transfer roll system to smoothly move trusses from the gantry table to the feed rollers to eliminate an employee having to physically push a truss over); *see also* [Williams Dep. 50:16-51:10] (explaining that "there's no reason for a human being to have to go over there unless they're doing maintenance" after performing the proper lock out/tag out procedure). In addition, the Operator's Manual for the Final Roller provided a direct and

specific warning to users that the only time an individual is permitted to enter the area in front of the Final Roller, where Plaintiff's injury occurred, is when the electrical connection to the equipment is cut off and the Final Roller is under lockout/tagout. *See* [D.E. 42-6 at 7]; *see also* [Watts Dep. 61:16-22] ("He shouldn't be in the area in front of the machine to start with. . . . It's very clear in our instructions that [individuals] do not enter that area unless all the machines are cut off and locked out and tagged out.").

An analysis of the factors Louisiana courts typically apply demonstrates that RMC and Plaintiff's use of the Final Roller could not have been reasonably anticipated by Rand. *See Broussard*, 463 F. Supp. 2d at 606 (outlining four factors analyzed in a determination of whether a use is reasonably anticipated). First, RMC and Plaintiff's use of the Final Roller in a broken condition, in direct contravention of the designed and intended use as an automatic process, and by manually feeding a truss while standing in a restricted area is obviously dangerous. *See* [Jackson Dep. 79:19-82:6] (explaining that he placed himself in a dangerous position and that once the Final Roller began to process the truss his injuries were unavoidable). Second, Rand instructed users of the Final Roller, through the Operator's Manual, not to enter the restricted area when the Final Roller was active and, when entering the area to conduct maintenance, performing proper lockout/tagout procedures. *See* [D.E. 42-6 at 7-8].

Third, RMC's decision to continue operating the Final Roller with the knowledge that the feed rollers were broken and Plaintiff's positioning in the restricted area without disengaging the electrical connection to the Final Roller was in direct contravention of the instructions and warnings Rand provided in the Operator's Manual. *See* [D.E. 42-6 at 4, 7-9]; *see also Broussard*, 463 F. Supp. 2d at 606 ("whether the use of the product was expressly warned against in the product's labeling (*or operations manual*) and the language of that warning") (emphasis added); *Kampen*, 157 F.3d at 313 (noting that, even if the manual did not reach the ultimate user, the

language of the manual is indicative of the dangers posed by the equipment). Finally, Plaintiff was an experienced user of equipment at RMC and should have been familiar with safety policies regarding the equipment. Plaintiff underwent the safety training at RMC twice, once for each stint of employment, and received on-the-job training from supervisors regarding recognizing the obvious danger posed by the Final Roller. *See* [Jackson 25:25-26:6; 26:14-21; 30:13-19] (identifying the training he received during each stint of employment and noting that he received training on unauthorized or restricted areas at the facility).

Notably, there is no record evidence that Rand was aware of Plaintiff, RMC, or any other truss manufacturer's manual operation of the Final Roller in a broken condition and thus as a manual process. RMC and Plaintiff's operation of the Final Roller in a broken condition, thereby converting the automatic process to a manual process, was not a reasonably anticipated use of the machine.

### b. Rand could not have reasonably anticipated that RMC would manually operate the Final Roller in violation of OSHA regulations regarding safeguards.

As Plaintiff's employer, RMC was obligated under OSHA regulations to provide additional safeguarding for the Final Roller at the time that it converted the intended use of the equipment from an automatic to a manual process. RMC and Plaintiff's decision to operate the Final Roller manually in a broken condition rather than automatically as intended was a fundamental change in the intended use of the equipment. [Deposition of Michael Taubitz 63:15-24].[2] When a user of

---

[2]     Plaintiff recently filed his "Daubert Motion to Exclude the Expert Testimony of Michael Taubitz" and a supporting Memorandum of Law. [D.E. 39 and 40] (Rand notes that the timing of Plaintiff's filing is procedurally improper). Despite inaccurately characterizing the challenge as proceeding under the Daubert standard, the Motion is instead a motion to exclude under Rule 702(a) for a purported lack of expertise. Plaintiff's arguments are absurd for numerous reasons, including arguing that Mr. Taubitz is not qualified to provide opinions regarding the applicability of various American National Standards Institute ("ANSI") standards that Plaintiff's own expert relied upon in reaching his opinions. What Plaintiff failed to inform the Court is that Mr. Taubitz was a member of the committee that developed these standards and is in the best possible position to testify as to their meaning and applicability. Rand contests Plaintiff's Motion to Exclude and will respond fully in opposition to the Motion according to the briefing schedule established by the Local Rules.

a product makes a change of this nature, the obligation is on the ***user*** to perform a risk assessment and reduction for the new intended use of the machine and to incorporate additional guarding as needed. [Taubitz Dep. 66:2-12; 72:6-24; 73:7-74:1]; *see also* 29 C.F.R. 1910.212 (outlining the general requirements for machine guarding applicable to employers). Mr. Taubitz testified that when an employer purchases a piece of equipment and then wants to change the intended purpose of that equipment, the employer is obligated to follow the design hierarchy of controls. [Taubitz Dep. 73:11-74:10]. An employer is therefore required to determine whether a hazard can be eliminated or substituted and if it cannot, the employer must then supply adequate guarding and engineering controls to protect its employees. [Taubitz Dep. 73:17-74:10]. The obligation to provide additional guarding, especially when the intended use of the equipment is fundamentally altered, is not placed on the manufacturer of the equipment, but on the employer, in this case, RMC. *See Sistrunk v. Dake Corp.*, No. CIV.A. 13-2983, 2015 WL 4164910, at *6 (E.D. La. July 9, 2015) ("Further, several courts have highlighted the applicability of this standard [29 C.F.R. 1910.212] to employers.").

There is no evidence that Rand could have reasonably anticipated RMC and Plaintiff's use of the Final Roller in a broken condition, which resulted in a fundamental alteration of the intended use of the equipment. Failure to establish a reasonably anticipated use of the product is fatal to Plaintiff's claim. *See* La. Stat. Ann. § 9:2800.54 (Claimant has the burden of proving the damage arose from a reasonably anticipated use); *see also Kampen*, 157 F.3d at 309 ("If a plaintiff's damages [do] not arise from a reasonably anticipated use of the product, then the 'unreasonably dangerous' question need not be reached."). Because Plaintiff has presented no evidence that his damages arise from a reasonably anticipated use, his claim fails as a matter of law.

13

## II. THE DESIGN OF THE FINAL ROLLER WAS SAFE FOR ITS INTENDED USE AS AN AUTOMATIC PROCESS.

In addition to Plaintiff's failure to adduce evidence that he was engaged in a reasonably anticipated use of the Final Roller, there is no evidence that the Final Roller was unreasonably dangerous in design. *See* La. Stat. Ann. § 9:2800.56. To prove a product is unreasonably dangerous in its design, a plaintiff must show that, at the time the product left the manufacturer, there was an alternative design that was capable of preventing plaintiff's damage. *See id.* § 9:2800.56(1). Plaintiff argues that alternative designs could have been implemented to prevent Plaintiff's injuries. *See* [D.E. 1 at ¶ 22]. Plaintiff pointed to two specific alternative designs that Rand could have implemented, a light screen or chain and a modified safety bar, neither of which are sufficient guards for the intentional access to the restricted area undertaken by Plaintiff. [Taubitz Dep. 85:20-86:24] (identifying the chain and light screen); *see also* [Taubitz Dep. Ex. 1 at 2] (photograph of the chain and light screen), attached as Exhibit B; [Taubitz Dep. 93:7-21] (identifying the Mi-Tek final roller and safety bar; [Taubitz Dep. Ex. 2] (photograph of the Mi-Tek final roller), attached as Exhibit C.

In suggesting these alternative designs, Plaintiff incorrectly characterizes the exposure that the alternative design is intended to prevent. Light screens, chains, and similar point of operation guarding are designed to prevent inadvertent access to a hazard. [Taubitz Dep. 164:8-17]. These types of guards will not prevent deliberate access to a restricted area like the access that led to Plaintiff's injuries. [Taubitz Dep. 87:1-16; 152:15-24]. To properly guard the Final Roller to function as a manual process, operator controls that would prevent the Final Roller from activating while the operator was in the restricted area would be required. [Taubitz Dep. 164:18-165:3]. The guarding RMC put in place after Plaintiff's incident, the light screen and chain that Plaintiff contends are an adequate alternative design, are insufficient to operate the Final Roller as a manual

process. [Taubitz Dep. 171:14-23]. Similarly, the modified safety bar utilized by the Mi-Tek final roller, a competitor of Rand, was insufficient for the operation of the final roller as a manual process. [Taubitz Dep. 171:24-172:8].

Further, Plaintiff's argument that the design of the Final Roller was unreasonably dangerous is contradicted by the history of use of the Final Roller itself. The President of Rand, Richard Watts, testified that his truss manufacturing company, Truswood, Inc., utilized the same style Final Roller for forty-seven years and "never had an accident on one of them." [Watts Dep. 56:20-21]. Further evidence of the sufficiency of the design of the Final Roller comes from RMC's operation of the Final Roller at issue here. From the purchase in 2012 to the date of the accident in 2018, RMC utilized the same style limit switch and safety bar continuously and had not had any incidents. [Allen Dep. 39:25-40:8].

Plaintiff has failed to present any evidence of an alternative design for the Final Roller that would have prevented the injuries caused when he intentionally accessed a restricted area of the machine to manually feed a truss into the Final Roller. Therefore, Plaintiff has failed to carry his burden in establishing a claim under § 9:2800.56 of the LPLA.

## III. THE FINAL ROLLER WAS NOT DANGEROUS TO AN EXTENT BEYOND THAT WHICH WOULD BE CONTEMPLATED BY AN ORDINARY USER OR HANDLER OF THE PRODUCT.

In addition to Plaintiff's failure to adduce evidence that he was engaged in a reasonably anticipated use of the Final Roller, there is no evidence that the Final Roller was unreasonably dangerous because of an inadequate warning. La. Stat. Ann. § 9:2800.57. To prove a product is unreasonably dangerous due to an inadequate warning, a plaintiff must show that the product, at the time it left the manufacturer's control, possessed a characteristic that may cause damage and that the manufacturer failed to use reasonable care to provide an adequate warning of such

15

characteristic to users and handlers of the product. *Id.* However, a manufacturer is not required to provide an adequate warning about the product when:

> (1) The product is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics; or

> (2) The user or handler of the product already knows or reasonably should be expected to know of the characteristic of the product that may cause damage and the danger of such characteristic.

*Id.*

Rand provided an adequate warning regarding the characteristics of the Final Roller which may cause injury. There were two warnings in place on the Final Roller itself warning users not to operate the machine without guarding and to avoid pinch points. *See* Jackson-000022, attached as Exhibit D. In addition, Rand provided several warnings in the Operator's Manual, including warnings regarding the restricted areas around the equipment, operation of the equipment in a broken condition, and the necessity of lockout/tagout procedures when entering the restricted area. While Rand provided adequate warnings regarding the Final Roller, these warnings were not required under § 9:2800.57(B).

Under § 9:2800.57(B), a manufacturer's duty to warn is limited to dangers that are beyond that which would be contemplated by the ordinary user of the product or dangers a user or handler of the product would not already know or reasonably be expected to know. *See* La. Stat. Ann. § 9:2800.57(B); *see also Ballam v. Seibels Bruce Ins. Co.*, No. 97-1444 (La. App. 4 Cir. Apr. 1, 1998), 712 So.2d 543, 550. For example, in *LaSalle v. Wilson Trailer Co., Inc.*, the Louisiana appellate court held that the dangerous condition presented by a grain trailer should have been apparent to a worker who was walking on the product in the trailer while the hopper at the bottom of the trailer was opened. 2000-1731 (La. App. 3 Cir. 5/30/2001), 787 So.2d 1173, 1175, *writ*

*denied*, 2001-2336 (La. 11/16/01), 802 So.2d 615. The employee was covered by the quick moving product and suffered brain damage due to a lack of oxygen and later died. *LaSalle v. Wilson Trailer Co.*, 2000-1731 (La. App. 3 Cir. 5/30/2001), 787 So.2d 1173, 1175, *writ denied*, 2001-2336 (La. 11/16/01), 802 So.2d 615. The court concluded that the employee, who had only been employed for five days unloading two loads per day, had enough experience with the dangerous condition that he should have been aware of the speed at which product flowed from the truck and that the condition could cause a person to become trapped in the product. Because the employee should have known of the dangerous condition, the trailer company did not owe a duty to warn plaintiff and, plaintiff's claim under § 9:2800.57 failed.

Even more so than the trailer in *LaSalle*, the Final Roller presents an open and obvious condition of which Plaintiff was aware. Plaintiff testified to the danger posed by the Final Roller. [Jackson Dep. 79:2-82:6; 81:1-11] ("And at that point, I didn't have a split second to get out of the way because that machine moves rapidly. It pulls and it jerks rapidly and it's—Like I said, it's stronger than I." "It would have crushed me . . . It wasn't nothing that could stop it."). In fact, each RMC employee that was deposed testified to the open and obvious nature of the hazard presented by the Final Roller. [Niblett Dep. 67:16-23]; *see also* [Allen Dep. 51:21-52:1]; [Hudson Dep. 25:9-18]; [Loyola Dep. 16:21-17:2]. Unlike the employee in *LaSalle* who had only worked five days at two truckloads per day, Plaintiff had worked as a stacker on the Rand Final Roller Monday through Saturday from 6:30 A.M. to 5:00 P.M. for almost a month during which time he was busy and working the whole shift. [Jackson Dep. 35:21-36:15]. Through this work, Plaintiff knew or should have known of the characteristic of the final roller that may cause damage and the danger of that characteristic. *See* La. Stat. Ann. § 9:2800.57(B)(2).

Further, the Final Roller is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product. *See* La. Stat. Ann. § 9:2800.57(B)(1).

17

The danger posed by the Final Roller is a crush hazard associated with the two twenty-four-inch metal rollers inside the machine. The space between the two rollers is approximately an inch and a half. [Williams Dep. 47:16-21]. Any ordinary user, operating the Final Roller for even a short period, would understand the hazard that the Final Roller posed. While it did provide an adequate warning on the equipment and in the Operator's Manual, Rand was under no obligation to provide such warnings under the LPLA due to the open and obvious hazard presented by the Final Roller.

## IV. REASONABLE MINDS CANNOT DIFFER THAT RMC AND PLAINTIFF ARE COMPLETELY AT FAULT FOR PLAINTIFF'S INJURIES.

Reasonable minds cannot differ that fault for Plaintiff's injuries lies solely with Plaintiff and RMC. Louisiana follows the doctrine of comparative fault. *See* La. Civ. Code Ann. Art. 2323(a) ("In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, *regardless of whether the person is a party to the action or a nonparty . . . .*") (emphasis added). While questions of comparative fault are ordinarily not appropriate for summary judgment, where reasonable minds cannot differ, a question of comparative fault is a question of law that may be resolved by summary judgment. *Pruitt v. Nale*, 45,483 (La. App. 2 Cir. 8/11/10), 46 So.3d 780, 783. While Rand takes no position concerning the allocation of fault between Plaintiff and RMC, it is clear that the entirety of fault for Plaintiff's injuries lies with Plaintiff and RMC.

### a. Plaintiff's comparative fault.

Plaintiff testified that he took it upon himself to manually operate the Final Roller. [Jackson Dep. 71:6-14] (adjusting the trusses was "pretty much off the top of my head, just instincts"). When viewing the surveillance video during his deposition, Plaintiff could not explain why he walked in front of the Final Roller,

> [F]rom that day to this day I still don't know why I was in there.
> Why was I in that area with that brace from the bottom of that truss
> even after straightening up the other side?  That's how I got caught
> in the machine, right there
>
> . . .
>
> Why would I put myself in that particular—in that area?
>
> . . .
>
> I'm trapped.  Because after I straightened up the—the corner piece
> so that it can go through, the line—the long board is pretty much
> aligned to a point where it's either me or the machine.

[Jackson Dep. 79-80].  Plaintiff's actions, specifically the manual loading of the Final Roller and the failure to be cognizant of his surroundings, and the open and obvious hazard presented by the Final Roller, were the cause of his injuries.  Plaintiff's own testimony makes his negligence clear.

### b. RMC's comparative fault.

Although RMC is not a party to this action, a percentage of fault for Plaintiff's injuries can be assigned to RMC.  *See Gordon v. Great W. Cas. Co.*, No. 2:18-CV-00967 (LEAD), 2020 WL 3472634, at *3 (W.D. La. June 25, 2020) (noting that the Louisiana Supreme Court has repeatedly affirmed the application of fault to all potential tortfeasors, including non-parties who will never be held financially responsible under any theory of liability).  This is true even in cases where an injured worker's employer was immune from tort liability under workers' compensation law where there is a finding that the employer caused or contributed to the employee's injury.  *See Moore v. Safeway, Inc.*, 95-1552 (La. App. 1 Cir. 11/22/96), 700 So.2d 831, *writ denied*, 97-2921 (La. 2/6/98), 709 So.2d 735, and *writ denied*, 97-3000 (La. 2/6/98), 709 So.2d 744.

RMC caused or contributed to Plaintiff's injuries in numerous ways.  First, by failing to avail itself of the Operator's Manual for the Final Roller.  RMC did not contact Rand to obtain a copy of the Operator's Manual for the Final Roller.  [Allen Dep. 18:24-19:5; 61:14-17]; *see also*

[Niblett Dep. 15:1-18]. Second, RMC's employees failed to implement pre-shift equipment checks. The Final Roller had not been inspected before Plaintiff's shift on the day of the incident. [Allen Dep. 33:5-21; 50:11-13] (stating that he looked at the limit switch and tested the safety bar a couple of days before the incident and then not again until the afternoon after the incident and stating that the inspection policy changed to before every shift after the incident); [Loyola Dep. 31:16-32:5] (stating that he tested the safety bar the day before the incident and that it was working as intended).

Third, RMC failed to maintain its equipment and failed to repair the broken condition of the feed rollers. RMC's continued operation of the Final Roller with the knowledge that several feed rollers were broken required an employee to manually load trusses into the Final Roller. [Allen Dep. 45:16-47:2] (stating that he had been informed that the feed rollers were not operating as designed or intended a couple of days before the incident); *see also* [Smith Dep. 54:10-22]; [Surveillance Video at time stamp 07:36:50]. The Final Roller's Operator's Manual warned users that "under no circumstances should the equipment be operated with damaged or non-manufacturer supplied parts. *See* [D.E. 42-6 at 8]. Despite this warning and actual knowledge of the broken condition of the feed rollers, RMC continued operating the equipment. Sadly, the required repair for the feed rollers was a five-to-ten-minute fix and the materials to conduct the repair were on site. [Allen Dep. 47:1-48:5].

Finally, RMC failed to properly train and supervise its employees and failed to implement any additional guarding as required by OSHA regulations following the intentional conversion of the automatic process of the Final Roller into a manual process. RMC failed to implement adequate safety rules regarding employee access to the restricted areas identified in the Final Roller's Operator's Manual. [Niblett Dep. 53:4-11]. In fact, RMC's safety manager, Jason Niblett, stated that before the incident laborers at the facility could go into the restricted area.

20

[Niblett 61:3-5]. Despite permitting employees to access the restricted area and converting the automatic process to a manual process, RMC provided no additional guarding, established no new protocols, and provided no additional training for its employees. [Niblett 25:3-17].

Reasonable minds cannot differ that Plaintiff's own actions and the acts and omissions of RMC were the sole cause of Plaintiff's injuries. Therefore, Rand is entitled to summary judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, Rand Manufacturing, Inc., respectfully requests that the Court grant its motion for summary judgment.

This the 11th day of May, 2021.

**TEAGUE CAMPBELL DENNIS & GORHAM, LLP**

By: /s/ J. Matthew Little
      J. Matthew Little – N.C. Bar No. 20032
      Daniel T. Strong – N.C. Bar No. 49546
      4700 Falls of Neuse Road, Suite 450
      Raleigh, North Carolina 27601
      mlittle@teaguecampbell.com
      dstrong@teaguecampbell.com
      Phone: 919-873-0166
      Fax:    919-873-1814
      *Attorneys for Defendant Rand Manufacturing, Inc.*

      G. Adam Cossey (*pro hac vice*)
      **HUDSON, POTTS & BERNSTEIN, LLP**
      1800 Hudson Lane, Suite 300
      Monroe, La 71201
      Telephone: (318) 388-4400
      Fax: (318) 322-4194
      *Attorney for Defendant Rand Manufacturing, Inc.*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.2(f)(3)(A)**

The undersigned hereby certifies that the foregoing Memorandum of Law in Support of

Defendant Rand Manufacturing, Inc.'s Motion for Summary Judgment complies with the 8400-

word limit of Local Rule 7.2(f)(3)(A), as the Memorandum contains 6739 words.

By:   /s/ J. Matthew Little
        J. Matthew Little – N.C. Bar No. 20032
        Daniel T. Strong – N.C. Bar No.  49546

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing **Memorandum of Law** has been electronically-filed in compliance with Rule 5 of the Federal Rules of Civil Procedure and Local Civil Rule 5.1 and served upon the parties as follows:

Sean T. Partrick
**YATES, MCLAMB & WEYHER, LLP**
434 Fayetteville Street, Suite 220
P.O. Box 2889
Raleigh, NC 2760127602-2889
spartrick@ymwlaw.com
*Attorney for Plaintiff*

Brett N. Tishler
Robert M. Caplan
**WHITE & WILLIAMS, LLP**
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103-7395
tishlerb@whiteandwilliams.com
caplanr@whiteandwilliams.com
*Attorneys Pro Hac Vice for Plaintiff*

Bobby R. Manning
**MANNING LAW FIRM**
320 Pine Street
Monroe, LA 71201
bobby@bobbymanning.com
*Attorney Pro Hac Vice for Plaintiff*

This the 11th day of May, 2021.

**TEAGUE CAMPBELL DENNIS & GORHAM, LLP**

By:  /s/ J. Matthew Little
     J. Matthew Little – N.C. Bar No. 20032
     Daniel T. Strong – N.C. Bar No. 49546

23