IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-CV-447-BR

| ROBERT JACKSON, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | ORDER |
| v. | ) | |
| | ) | |
| RAND MANUFACTURING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant Rand Manufacturing, Inc.'s ("Rand") motion for summary judgment, (DE # 41), to which plaintiff filed a response in opposition, (DE # 48), and Rand replied, (DE # 53). Also before the court are plaintiff's motion in limine, (DE # 40), and motion for leave to file a sur-reply, (DE # 54). These motions have been fully briefed and are ripe for disposition. The motion for leave to file a sur-reply will be allowed and the proposed sur-reply, filed at docket entry 54-1, will be accepted.

## I. BACKGROUND

Rand is a manufacturer of equipment used to make wooden trusses for building construction. (Pl.'s Resp. Statement of Facts, DE # 47, at 2.) Part of the equipment Rand manufactures—final rollers—press the trusses between two metal cylinders to secure metal nail plates into the connected points of each truss. (Id.) In 2008, Rand sold the final roller at issue in this case ("Final Roller") to now-defunct truss manufacturer, American Truss. (Id. at 9.) In 2012, plaintiff's former employer, Rogers Manufacturing Corporation ("RMC"), purchased the Final Roller at a bankruptcy auction. (Id.) The Final Roller was then moved from the American Truss facility to the RMC facility, where it was installed by RMC's maintenance supervisor.

(Id.) When RMC purchased the Final Roller at the bankruptcy sale, it did not receive a copy of the operator's manual. (Id.)

The operator's manual describes two "Restricted Zones" and instructed that "PERSONNEL MUST STAND CLEAR OF THE RESTRICTED ZONES 'A' & 'B'" when the roller is active. (DE # 42-6, at 4.) It warned: "SERIOUS INJURY OR DEATH MAY RESULT TO PERSONNEL IN THE REST[R]ICTED ZONES 'A' & 'B' WHEN MACHINERY IS ACTIVE." (Id.) The manual also provides "SAFETY & OPERATING INFORMATION," including directions to check the operation of the safety bars and brake before each shift and explaining that personnel should never enter the restricted areas unless all air and electric is disconnected. (Id. at 7.) Finally, the manual warns "WARNING: WHENEVER THIS MACHINE IS OPERATING, KEEP HANDS AND OTHER BODY PARTS CLEAR OF THE WORKING ROLLERS," (id. at 9), "SERIOUS INJURY OR DEATH MAY RESULT IF THIS MACHINE IS NOT OPERATED AND MAINTA[I]NED PROPERLY," (id. at 8). The Final Roller also bore two stickers reading: (1) "CAUTION DO NOT OPERATE MACHINERY WITHOUT GUARDS" and (2) "DANGER PINCH POINT Keep Hands and Feet Clear." (Mem. Opp'n, DE # 48, at 3; Photo, DE # 43-4.)

At RMC's facility, employees lay out and assemble trusses on a gantry table. (See Pl.'s Resp. Statement of Facts, DE # 47, at 4.) A gantry press rolls over the trusses to seat the plates, then employees shift the trusses onto to feed rollers, which lead to the Final Roller. (Id.) When operational, the feed rollers carry the truss to and through the Final Roller where the connecting plates are fully secured. (Id. at 5.) After the truss exits the Final Roller, an employee called a "stacker" removes the truss. (Id.) In 2018, plaintiff was employed at RMC as a stacker. (Id. at 10.) Plaintiff had previously worked at RMC as a stacker. (Niblett Depo., DE # 43-9, at 4.)

2

On 19 October 2018, plaintiff was assigned to work on the Gantry 3 Final Roller. (See Jackson Depo., DE # 42-11, at 15.) During plaintiff's shift, several of the feed rollers that convey the trusses to the Final Roller were not functioning. (Pl.'s Resp. Statement of Facts, DE # 47, at 7, 10.) Thus, a truss moving towards the Final Roller may become stuck on the rollers before reaching the Final Roller. That morning, plaintiff walked in front of the Final Roller and attempted to manually feed a truss into the Final Roller. (Jackson Depo., DE # 43-7, at 16; see Jackson Depo. DE # 42-11, at 18 (acknowledging he was between the truss and the Final Roller).) Positioned between the truss and the Final Roller when the long board entered the Final Roller, plaintiff became trapped. (Id. at 18–19.) As the Final Roller grabbed the truss to pull it in, the remaining part of the truss pushed plaintiff into the Final Roller, injuring his leg. (Pl.'s Resp. Statement of Facts, DE # 47, at 13–14.)

## II. DISCUSSION

**A. Rand's motion for summary judgment**

Summary judgment is appropriate when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment must demonstrate the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). To do so, "[t]he nonmoving party must 'go beyond the pleadings' and rely on some form of evidence, including affidavits, to demonstrate that a genuine issue of material fact exists." Banks v. Gore, 738 F. App'x 766, 770 (4th Cir. 2018) (quoting M

& M Med. Supplies and Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir. 1992)).  In other words, "the nonmoving party must produce more than '[c]onclusory or speculative allegations' or 'a mere scintilla of evidence.'"  Atkins v. Glaser T, 823 F. App'x 218, 219 (4th Cir. 2020) (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson, 477 U.S. at 247–48.  In determining whether a genuine issue of material fact exists, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party.  Scott v. Harris, 550 U.S. 372, 378 (2007).

Plaintiff's claims arise under the Louisiana Products Liability Act ("LPLA").  The LPLA establishes liability for a manufacturer of a product "for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity."  La. Stat. Ann. § 9:2800.54(A).  A product may be "unreasonably dangerous" only (1) in construction or composition, (2) in design, (3) for failure to provide an adequate warning, or (4) for nonconformity to an express warranty.  Id. § 9:2800.54(B).

Here, plaintiff asserts the Final Roller was unreasonably dangerous in design and for failure to provide an adequate warning.  (See Compl., DE # 1, at 4–5.)  However, "'[r]easonably anticipated use' is the threshold LPLA element."  In re Crosby, 540 F. Supp. 3d 588, 594 (E.D. La. 2021) (citation omitted).  Thus, "[w]ithout a reasonably anticipated use, a court need not analyze whether the product was unreasonably dangerous under one of the LPLA's four theories of liability."  Id.; see also Sistrunk v. Dake Corp., No. 13-2983 SECTION: R(4), 2015 U.S. Dist.

4

LEXIS 89231, at *10 (E.D. La. July 9, 2015) (quoting Kampen v. Am. Isuzu Motors, Inc., 157 F.3d 306, 309 (5th Cir. 1998)); Harvey v. Toyota Material Handling, USA, Inc., No. 05-0561, 2007 U.S. Dist. LEXIS 27633, at *13 (W.D. La. Apr. 13, 2007). As such, the court's analysis begins with whether the "damage arose from a reasonably anticipated use of the [Final Roller]." La. Stat. Ann. § 9:2800.54(A).

Rand contends plaintiff's use of the Final Roller was not a reasonably anticipated use because plaintiff chose to operate the Final Roller with knowledge that multiple feed rollers were broken, thus converting the process from an automatic one to a manual one. (Mem. Supp., DE # 43, at 8.) Rand asserts this was a misuse of the Final Roller and thus cannot be considered reasonably anticipated under the LPLA. (Id. at 9.) Finally, Rand argues plaintiff was an experienced user of the equipment and his actions were obviously dangerous and in contravention of the operator's manual. (Id. at 11.)

As an initial matter, plaintiff contends reasonably anticipated use is a question of fact which the jury, not the court, must resolve. (Mem. Opp'n, DE # 48, at 13.) Plaintiff also argues he "was using [d]efendant's final roller for pressing metal plates into wooden trusses -- exactly the use which [d]efendant anticipated and for which the machine was designed." (Id. at 10.) Finally, plaintiff asserts there is no evidence that powered feed rollers, or any conveyor at all, must be used with the Final Roller. (Id. at 12.)

The LPLA defines "reasonably anticipated use" as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La. Stat. Ann. § 9:2800.53(7). Unlike its earlier counterpart, the LPLA's definition of "reasonably anticipated use" does not include "'all reasonably foreseeable uses and misuses of the product.'" In re Crosby, 540 F. Supp. 3d at 594–95 (quoting Payne v. Gardner, 56

So. 3d 229, 231 (La. 2011)); see also Matthews v. Remington Arms Co., 641 F.3d 635, 647 (5th Cir. 2011) ("'[I]f damages are linked to a product misuse (i.e., one that is not reasonably anticipated), then those damages are not recoverable under the Act'" (quoting Kampen, 157 F.3d at 316)); Bates v. Progressive Tractor & Implement Co., LLC, No. 2021 CA 0338, 2021 La. App. LEXIS 2047, at *10 (La. App. 1 Cir. Dec. 22, 2021) (finding plaintiff "was engaged in a misuse rather than a reasonably anticipated use of [the product] at the time he was injured"). Thus, a "'manufacturer is not responsible for accounting for every conceivable foreseeable use' of its product." In re Crosby, 540 F. Supp. 3d at 595 (quoting Payne, 56 So. 3d at 231).

"In determining what constitutes a reasonably anticipated use, courts must engage in an objective inquiry and 'ascertain what uses of its product the manufacturer should have reasonably expected at the time of manufacture.'" Harvey, 2007 U.S. Dist. LEXIS 27633, at *13 (quoting Kampen, 157 F.3d at 309); see also Spears v. Cintas Sales Corp., 414 F. App'x 667, 669 (5th Cir. 2011) (noting reasonably anticipated use is an objective inquiry and rejecting plaintiff's contention that it cannot be decided on summary judgment). Thus, the LPLA definition "'effectively discourages the fact-finder from using hindsight.'" In re Crosby, 540 F. Supp. 3d 595 (quoting Payne v. Gardner, 56 So. 3d at 231). To make this determination, courts have considered factors such as:

> (1) whether the injured party used the product in a manner that was obviously dangerous; (2) what the user was instructed to do and warned not to do with respect to the use of the product; (3) whether the use of the product was expressly warned against in the product's labeling (or operations manual) and the language of that warning; and (4) the sophistication/experience of the user-purchaser.

Broussard v. Procter & Gamble Co., 463 F. Supp. 2d 596, 606 (W.D. La. 2006) (citations omitted); see also Benjamin v. Hausfeld, No. 1:12-cv-00020, 2013 U.S. Dist. LEXIS 91510, at *5 (W.D. La. June 28, 2013).

6

Before applying these standards, the court must identify plaintiff's "use" of the Final Roller. See Kampen, 157 F.3d at 310 ("the level of generality at which a plaintiff's 'use' of a product is defined will bear directly on whether the plaintiff satisfies the LPLA's reasonably anticipated use requirement"). In Kampen, the plaintiff used a tire jack to elevate a vehicle, then slid his upper body under the vehicle, and was injured when the jack collapsed. Id. at 308–09. There, the Fifth Circuit recognized if "[the plaintiff's] 'use' of the jack includes his jacking up the car and nothing else, then the question of reasonably anticipated use answers itself: a manufacturer quite reasonably anticipates his jack to be used for jacking!" Id. at 310. However, the court ultimately defined the plaintiff's use to include "his behavior subsequent to the physical act of elevating the car (i.e., his crawling under the car)." Id. Comparably, in Matthews, the plaintiff was injured when the rifle he was firing exploded. 641 F.3d at 649. In that case, the Fifth Circuit noted that the critical question was whether the plaintiff's use of the rifle was limited to simply firing it or included firing the rifle without reinstalling the bolt-assembly pin after removing it. Id. at 644. In deciding the use of the rifle included removing and failing to reinstall the bolt-assembly pin, the Fifth Circuit noted "use" "is determined by examining overall interactions with a product." Id. at 646; see also Tatum v. Southern Sys., No. 1:008-cv-00610, 2010 U.S. Dist. LEXIS 72201, at *10 (W.D. La. July 19, 2010) (holding "[plaintiff's] 'use' of a dual strand conveyor did not merely include receiving the compressors transported by the machine," but also included her actions "which 'increase[d] the risk of injury associated with' the conveyor").

Here, plaintiff defines his use of the Final Roller as "pressing metal plates into wooden trusses," which he contends is the use for which the machine was designed. (Mem. Opp'n, DE # 48, at 10.) However, as discussed above, defining plaintiff's "use" requires more than merely

considering whether he was operating the machine for its intended purpose. Much like the jack in Kampen and the rifle in Matthews, plaintiff's use of the Final Roller includes his actions which increased the risk of injury. Thus, to survive summary judgment plaintiff must produce sufficient evidence that, at the time of manufacture, Rand should have reasonably expected that an ordinary user of its Final Roller would place himself between the truss and the Final Roller to manually feed a truss into the Final Roller. See In re Crosby, 540 F. Supp. 3d at 594 (noting plaintiff bears the burden of proving each element of an LPLA claim).

Rand asserts

> [i]n developing and manufacturing the Final Roller, [it] created an automatic process for conveying trusses from the gantry table to the Final Roller via feed rollers. The intended use of the equipment, as designed, required no human interaction with the trusses or Final Roller for this process to take place.

(Mem. Supp., DE # 43, at 8.) However, plaintiff argues the feed rollers were not a component part of the Final Roller and "there is no evidence in any of [d]efendant's materials -- not in its manual nor in its web site -- that begins to suggest that powered feed rollers must be used with the final roller, or that any sort of conveyor at all, powered or manual, must be used with the final roller." (Mem. Opp'n, DE # 48, at 12.)

To the contrary, the Final Roller's operator's manual explains that the only time an individual is permitted to enter the area in front of the Final Roller is when the electrical connection to the equipment is disconnected.[1] (Manual, DE # 42-6, at 7–8.) Since the manual prohibited human presence in front of the Final Roller while in operation, Rand reasonably expected some form of conveyor would be used with the Final Roller. Additionally, Richard Watts, President of Rand, testified that no one should "be in the area in front of the machine"

---

[1] It is immaterial at this stage whether the operator's manual reached plaintiff (or his employer). See Matthews, 641 F.3d at 638 (noting the plaintiff "testified he neither received, nor read, the owner's manual prior to the accident").

"unless all the machines are cut off and locked out and tagged out." (Watts Depo., DE # 42-16, at 8.)

Much like it was foreseeable that a user might drop the bolt-assembly pin in Matthews, it may have been foreseeable that a user would need to enter the area in front of the Final Roller in order to make repairs, as evidenced by the operator's manual instruction to disconnect power beforehand. See Matthews, 641 F.3d at 647 (noting the manual instructed "assembly workers to keep a finger beneath the bolt-assembly-pin hole during the initial assembly," and instructed users to "reinstall the bolt-assembly pin when reassembling the bolt assembly"). However, "[t]he standard is: at the time of manufacture, how did the manufacturer reasonably expect its product to be used by an ordinary person." Id. At the time of manufacturing, the Fifth Circuit held, the rifle manufacturer in Matthews did not expect the weapon to be fired without the bolt-assembly-pin installed. Id. Likewise, here, Rand did not expect the Final Roller to be in operation with a human in front of it.

While plaintiff contends the feed rollers were not a component of the Final Roller and thus Rand could not have reasonably expected any feed rollers would be used, Rand has presented ample evidence that the Final Roller functioned as a part of a system, which included powered feed rollers and required no human interaction. (Watts Depo., DE # 42-16, at 8 (noting no one should enter the area in front of the machine "unless all machines are cut off and locked out and tagged out"); Watts Depo., DE # 53-1, at 2 ("[T]hat whole system is designed to have motorized rolls that feed that truss into the machine."); Smith Depo., DE # 43-10, at 4–6, 7–8 (testifying "the intended design of the roller" was automatic and no human input is needed if the system is working as intended); Hudson Depo., DE # 53-3, at 2 (testifying that the idea is that the truss is supposed to move into the press without being physically pushed); Allen Depo., DE 43-5,

9

at 9 (testifying if everything goes right, the rollers move the truss into the final roller automatically, without anyone having to manually push the truss in); Loyola Depo., DE # 43-8, at 2 (testifying that the rollers would automatically take the truss to the press; people did not physically push the truss into the roller).) In fact, plaintiff himself testified that the rollers "should be able to roll [the trusses] all the way to the press machine," and he would wait for them to come out the other side. (Jackson Depo., DE # 43-7, at 10.) Plaintiff also testified, "I still don't know why I was in there. Why was I in that area with that brace from the bottom of the truss . . . [,]" "I still can't figure out why I was out in that–Why would I put myself in that particular–in that area?" (Jackson Depo., DE # 42-11, at 19.) Plaintiff has failed to present credible evidence that, at the time of manufacture, Rand should have reasonably expected the Final Roller to operate without some form of conveyor system.[2] (Cf. Williams Depo., DE # 52-1, at 9 (testifying "you could have a final roller without any rollers in front of it," and noting he'd seen this in Florida in the 1960s, but "[t]hat's not something [Rand] did," "[t]here's normally always – rollers."))

Additionally, the factors outlined in Broussard support the conclusion that plaintiff's use of the Final Roller was not "reasonably anticipated." First, placing himself in front of the Final Roller, between the truss and the roller, was obviously dangerous. Plaintiff himself testified that he did not know why he put himself in that area and that once he did he was essentially trapped. (Jackson Depo., DE # 42-11, at 19.) He explained that the machine moves rapidly and is stronger than he is, so once you put a truss into it "it's going through," leaving him with nowhere else to go. (Id. at 20.) Next, two labels on the Final Roller warned: (1) "CAUTION DO NOT OPERATE MACHINERY WITHOUT GUARDS" and (2) "DANGER PINCH POINT Keep

---

[2] In fact, plaintiff's primary argument is that because no conveyors were sold with the Final Roller, Rand had *no* expectation of whether the machine would be used with rollers.

Hands and Feet Clear." (Mem. Opp'n, DE # 48, at 3; Photo, DE # 43-4.) Additionally, as discussed above, the operator's manual warned that users should never enter the area in front of the Final Roller unless all electrical has been disconnected. (DE # 42-6, at 7–8.) The manual also warned: "SERIOUS INJURY OR DEATH MAY RESULT TO PERSONNEL IN THE REST[R]ICTED ZONES 'A' & 'B' WHEN MACHINERY IS ACTIVE." (Id. at 4.) Thus, plaintiff's positioning himself in front of the Final Roller and attempting to feed a truss into it, while the Final Roller was active was warned against. Finally, plaintiff was an experienced user of the Final Roller as he had twice worked as a stacker at Rand and had received safety training for each stint of employment. (Jackson Depo., DE # 43-7, at 3–5; Niblett Depo., DE # 43-9, at 4.)

As such, the court cannot conclude that at the time of manufacturing, Rand should have reasonably expected an individual to place himself between the truss and the machine to manually feed a truss into the machine. Plaintiff has failed to meet his burden of showing that his injuries arose from a reasonably anticipated use of the Final Roller and the court need not reach whether the product was unreasonably dangerous.

**B. Plaintiff's motion in limine**

Plaintiff moves to exclude the expert testimony of Michael Taubitz under Rule 702 of the Federal Rules of Evidence. (DE # 40.) Plaintiff argues that Mr. Taubitz is not qualified to offer opinions regarding the design of the Final Roller, its reasonably anticipated use, the adequacy of its warnings, or its unreasonably dangerousness nature. (DE # 39, at 1.) Plaintiff also requests that Mr. Taubitz's opinions regarding OSHA/workplace safety standards be excluded. (Id.) As demonstrated above, the court did not rely on any of Mr. Taubitz's opinions in ruling on the motion for summary judgment. As such, plaintiff's motion to exclude his testimony is moot.

11

## III. CONCLUSION

For the reasons stated herein, plaintiff's motion in limine, (DE # 40), is DENIED as moot. His motion for leave to file a sur-reply, (DE # 54), is ALLOWED. Rand's motion for summary judgment, (DE # 41), is ALLOWED. The Clerk is DIRECTED to enter judgment in favor of Rand and close this case.

This 2 March 2022.

W. Earl Britt
Senior U.S. District Judge